Good afternoon, Your Honors. Russell Marschak for Petitioner Maung Win Thaung. May it please the Court, first I'd like to note for the panel that I just today handed the Clerk a Rule 28J letter highlighting, I'm sorry, I just handed the Clerk of the Court a Rule 28J letter highlighting a recent decision in matter of Jabril v. Gonzalez which goes to the issue, the principal issue here which is the credibility of the respondent. In that case the Court held that if this Court finds the judge's adverse credibility findings were speculative and conjectural then it has to reverse the decision. We're maintaining and have maintained throughout the course of this litigation that the findings of the judge were indeed speculative and conjectural. This case really highlights the problems of trying to litigate what happened in an asylum interview in the immigration court. We have a situation where the asylum officer was brought in to testify using principally his notes which were illegible to the Court and the parties. I guess in part they were illegible to him and his assessment but he admitted up front that he had absolutely no recollection of the asylum interview which had taken place three years prior. As a result we're left really with a difficult situation and try to understand what went on during that interview. The officer admitted during his testimony that he may not have recorded everything properly and accurately and so we're left with sort of this incomplete record of what happened then. The events that the officer testified to as happening during the You have none? No, no. Should we? Well, we believe it's pretty clear that the judge erred and I think it's been fairly well argued in the briefing here. We would ask the Court to find that the adverse credibility finding here was erroneous and was based upon speculation and conjecture. Okay, with that I will reserve the rest of my time for rebuttal in case it's needed. May it please the Court, my name is James Grimes, I represent the Attorney General. Your Honors, this immigration adverse credibility case presents a circumstance in which the adverse credibility determination is not based solely on the alien's discrepant testimony but it's also based upon an investigation conducted by a consular officer and based on the testimony of the asylum officer who interviewed the petitioner, Mr. Thong. Mr. Thong's claim was that he was abused in Burma based on his involvement with the NLD, the National League for Democracy, and he testified that he was, at page 236, a very important person in that party and he detailed what he claimed were his efforts in raising money for the party and recruiting and the trust that was imposed on him by the party. But a consular investigation revealed some problems with his claim. First, an investigation revealed that no one at NLD headquarters knew who he was and no one in Wakema where he concentrated his efforts knew who he was either. The identification card that he presented was apparently an older version that had been replaced in the late 1980s by a newer version that all NLD members had been given. Why is that significant? I don't understand when the counselor says well this is an authentic card but there's a later version how that hurts his credibility. It tends to show since the members were given a newer card that he was not in fact a member or was not involved with the NLD when the newer cards were issued in the consular investigation also revealed that people who are wanted by the Burmese government, as Mr. Thong said he was at page 145, cannot obtain a passport through a broker, cannot obtain a departure form, and cannot board a departing aircraft, which is also contrary to what Mr. Thong said happened to him and how he said he left Burma. And I invite your attention to pages 404 and 427 of the record where the State Department's reports indicate. How did this individual know all this? The consular officer said that was their experience with people who have asylum claims or have problems with the government in Burma rather that they are not able to do that. That was her experience in dealing with that sort of situation. What was the basis of that experience? I don't know if she specifically said that was the basis of her experience, but it is supported by the State Department country reports at pages 404 and 427. One time, maybe ten years ago, I was in Thailand flying out to Phnom Penh and the plane was all crowded and there were all kinds of commotions going on over there. It turned out that the people that work at the counter, what they do is the people they know or others just show up and give them some money and they go on the plane. I appreciate your honesty. They had two French pilots. They asked everyone to leave and then they had to check people in. It's not like, I don't think it's like we have in this country where there's a lot of security and restrictions and tickets and controls and all that. I apologize for interrupting. Myanmar is a pretty rough place, isn't it? The State Department country reports do not paint a picture of a place that we might want to visit, I wouldn't think. I appreciate your experience in Thailand, but the consular officer's experience in Burma is that is contrary to what Mr. Thong... His testimony, he didn't get it in his complete name. He paid a bribe, so he pays a bribe and he's not using his complete name. There's nothing in the record that shows that he's made that up. I respectfully beg to differ, Your Honor. How do you differ? What's the basis of your difference? The basis of my difference is the consular investigation... No, no, the consular says if you apply in your full name, if you give your full name, they won't give it to you. Now here's somebody who doesn't apply in his full name, but uses an intermediary and pays a bribe. That's a very different story. The consular investigation at pages 319 and 320 says that a person would not be able to pay a bribe to a broker if the government... What about that person? The consular officer does not know this particular person, does he? I seriously doubt it, Your Honor. So it's just a generalization that if you come in with your full name, you won't be able to get it. That's correct, Your Honor. All right, so there's no conflict there. I respectfully disagree. Tell me why you disagree. What I disagree is, Your Honor, that the consular officer said that a person cannot pay a bribe to a broker in order to get... Say that again. ...cannot get a passport through a broker if the person is wanted by the government and will not be allowed to board a departing aircraft if wanted by the government. At page 145 of the record, Mr. Thong... All right, take a look at that. I believe that's what it says at pages 319 and 320, Your Honor. All right. I think the problem with that is basically you're saying that nobody who comes from Myanmar by a passport can ever get asylum in the United States, right? If you follow that logic. If the person is wanted by the government, that's certainly one piece of... In other words, you have to be wanted by the government in order to get political asylum, and you can't get out of the country if you're wanted by the government. So the logical inference is, under that, that nobody from Burma can ever qualify for asylum based on political opinion. Excuse me, Your Honor. Right, if they came through or produced a valid visa or passport. If they left by aircraft or they left by land or found some other way in order to get out, then I suppose the story would be different. Yeah, we do have cases where we've granted asylum to people who come from Burma. So I guess we did that in error, I suppose. Well, I don't know what the circumstances of how they left or whether there was actually evidence in the record of a consular investigation. I'm certain that not every case involves a consular investigation. This one does. This one also involves... No, but I think... I guess the point I'm making is, and I'm not... We take it for what it is, but I guess the logical consequence is it doesn't make any difference whether there's been an investigation or not if we accept the facts as true in this case. Right? If he were credible, then I think that we would have a very different case. There was also the testimony of Officer Lumsden who said that Mr. Thong told him that after he was arrested in January of 1995, he was not injured, which, of course, is contrary to Mr. Thong's testimony in pages 176 to 179 where he said that his arm was broken and that he was held for 15 days blindfolded and beaten. Officer Lumsden also explained that Mr. Thong could not keep his story straight about the beginnings of his involvement with the NLD. He told a few different versions and eventually settled on saying that he first became involved in November of 1988, which, of course, is contrary to Mr. Thong's testimony. Well, this was all done through an interpreter. You're right, Your Honor. It was done through the interpreter that Mr. Thong brought to the interview. The asylum officer didn't note any problems with the interpretation, and I don't believe that Mr. Thong has raised that issue. I could be wrong, but I don't believe he's raised that issue in his brief to court. So it appears that there's a discrepancy regarding what Mr. Thong told Officer Lumsden and what he told the immigration judge. There's also the issue of the visa application. He testified at 245 that he told the consular officer that he worked as a medicine salesperson, which is why he said he got involved in protesting the government, but the visa doesn't reflect that. It reflects a different job, and the reason that's important is because his job as a medicine salesperson is why he got involved in protesting in the first place. Now, one single false statement in a visa application probably would not be enough to find an alien incredible, but here we have it, this is taken in context. He certainly didn't need to lie anymore when he testified before the immigration judge because his lie was no longer incidental to his flight from Burma. And then there's Mr. Thong's discrepant testimony. He was inconsistent about whether or not he was involved with the NLD from 1990 to 1994. He testified that he had no NLD activity from July 1990 to November 1994 at page 231, 171, and 172, but his amended asylum declaration at 453 said his wife took care of his business because he became more involved with politics during that time. And when he was directly questioned about that at pages 233 and 234 by the government counsel, he first contradicted his asylum application to say that his wife never took care of his business, and then he contradicted himself and said that she did take care of his business. There are certainly a number of other factors. My time is almost expired. Well, what do you say to this thing from the INS Resource Information Office, which is also in the record, that the government is willing to let dissidents out with the understanding the more we leave, the better it is for the government? Well, I would say that that certainly sounds different from what Mr. Thong, excuse me, from what the consular investigation indicated. I don't remember Mr. Thong relying on it in his brief, so I'm not specifically familiar with that page of the record. That's 361.  I'm not specifically familiar with that particular point from the INS Resource Information Office. I'm sorry, 361, Your Honor? It's the first full paragraph, and it's the last sentence of the first full paragraph in 361. Is that the paragraph beginning with other experts, Your Honor?  Yes, other experts. I'm sorry, that's the one in the middle. And then the first full paragraph, the last sentence. Yes, it looks to me as though this is a statement from an employee of the Free Burma Coalition. I think that's what it says at the top of the paragraph. The employee stated that when any Burmese applies for a passport, she must fill out a 40-page application form. I don't know if Mr. Thong testified about filling out a 40-page application form, and I don't know. I mean, it appears to me that that statement is actually from the Free Burma Coalition employee that's quoted at the top. I could be wrong. I'm just digging this off the cuff. I mean, look what goes on in that country. I'm reading from the State Department report. It's rather appalling. I don't think it's a very nice place, Your Honor. That's true. Let me start out here. The government's longstanding severe repression of human rights continued during the years. Citizens continued to live subject at any time and without appeal to the arbitrary and sometimes brutal dictates of a military dictatorship. Citizens didn't have the right to change their government. There continue to be credible reports in ethnic minority-dominated areas that soldiers committed serious human rights abuses, extrajudicial killings and rape. Disappearances continued. Members of security forces beat and otherwise abused detainees. And then it just goes on. It goes on in fine print for page after page. Thousands of citizens fled army attacks against the insurgents and remained in refugee camps. In Thailand at year's end, societal discrimination and violence against women, trafficking in women and girls and widespread adult and child prostitution are severe problems. I mean, it sounds like it goes on and on and on. It's not a very pleasant place, Your Honor. That's certainly true. We want to send people back there, do we? He still has his burden to meet. And as the court said in Bologna, the Seventh Circuit said in Bologna, credibility is a linchpin of a well-founded fear claim. He has to carry his burden, and he's not able to do that with discrepant testimony. My time is— Which of these go to the heart of his asylum claim? I would say that everything that the immigration judge relied on goes to the heart. The consular investigation really contradicts what he says. Officer Lumsden's testimony explained how Mr. Thong said he wasn't injured after the arrest in January of 1995. His discrepant testimony about whether his wife ran his business or not, that's important because he said that she— at one point he said she ran the business because he became more involved in politics. Then he said she didn't run the business. Then he said she did. There's the issue of the letter that he said that came from his wife that he said was smuggled in something, but it came in an envelope that was either at canceled stamps or arrived in damaged condition. There are a number of factors that support the adverse credibility determination. For that reason, we ask that you deny the petition. If there are no further questions— All right. Thank you. Excuse me. I only want to note that the State Department report itself corroborates the fact that—and this is on page—I just have it there. 389, the third full paragraph, the third sentence, corroborates the fact that this produced rampant corruption as many applicants were forced to pay large bribes to obtain passports. This wasn't something just brought up by the Free Burma Coalition. It was something the State Department itself recognized and really undermines the consular officer's claim. With that— How do you explain the results of the consulate's investigation, the investigation indicating that really nobody in the movement had ever heard of your client? This wasn't really an investigation, Your Honor. This was an opinion offered by a consular officer sitting in the embassy, which was based upon that particular officer's experience. I note that that— Right. He made some inquiries. We understand that this is a third hand, but all of these cases turn on facts that are very hard to ascertain. He made some inquiries. Nobody had heard of your client. What do we make of that? You're now talking about the fact that they asked people 12 years later in the NLD if they'd heard of this guy who was active in the NLD at its outset from 1988 to 1990. They were asking in the year 2000, when probably all the people who had been there at the time themselves were either arrested or fled. It's complete speculation. I don't know how the judge could have relied on such information. Okay. Thank you. Thank you. A matter of stance, admitted.
judges: Pregerson, Noonan, Thomas